## JULY TERM, 1842.

### SAMUEL SAMPLE *v.* JAMES C. PICKENS, *et al.*

S. contracted with P., and others, to do a piece of work, for a certain agreed price, and
receive his pay in the notes of a particular bank, or their equivalent, the price agreed
to be paid being but a fair compensation for the labor to be done ; before the work was
completed, the notes of the bank agreed upon depreciated, to be worth but one tenth
of their value at the time of the contract; S. filed his bill to enforce the payment in
good money, of the debt due him, which P. and others resisted, and claimed the right
to pay in the notes agreed on ; *held*, that the great depreciation of the notes was a cir-
cumstance not looked to, or provided for, by either party ; that it would be inequitable
to force S. to receive them, and that he was entitled to recover a fair price for the work
done, in current money.

THE bill in this case states, that in February, 1836, Hiram G.
Runnels, Malachi B. Hamer, Edmond Pursell, Israel W. Pickens,
Joseph C. Pickens, and Jacob Collins, and their successors, were
incorporated, by the legislature, proprietors of the town of Mont-
gomery, in Holmes county, and authorized by the act to make a
turnpike across Big Black Swamp, near said town ; and before any
steps were taken to construct the turnpike, Collins's interest was
sold, under execution, to James C. Bole ; and Israel W. Pickens
sold his interest to W. Kirkwood, and Pursell sold his interest to
Joseph C. Pickens ; which facts are stated in the bill from informa-
tion.   It is also stated, that the company was seised and possessed
of one eighth of land, or thereabouts, including said town and a ferry
across Big Black ; also pieces of land lying on the south side of
said river, between the ferry and the highlands, over which the
turnpike road runs ; that said Runnels, Bole, Hamer, Joseph C.
Pickens, and Kirkwood, then proprietors, on the 19th of August,
1838, entered into a contract with Thomas B. Ives, to construct
said road across the swamp ; that said Ives was to receive $15,000
for constructing said road, payable in the paper of the Mississippi
and Alabama Railroad Company, or the Grenada Bank, or their
equivalent ; that at the time said contract was entered into, these
banks, and especially the first, constituted the principal circulating
medium of that part of the State ; that it was received in payment

of executions and debts generally, since which the paper of the said banks had become greatly depreciated ; that the Grenada Bank was worthless, and the other was worth from ten to twenty cents in the dollar only.  The bill charges that the intention of the parties, at the time of said contract, was to guard against paying said sum of $15,000 in money which was not current in that section of the State, and that the constructing said road was worth $15,000 in current money in that section, and that the paper of said banks then furnished the currency, at the time and place when and where the contract was made ; and submits whether it would be just and right to compel him to receive the paper of said banks, now so much depreciated, in payment for his labor.  The bill charges, that it was the intention of the parties that the money should be paid in current money of the country, and that the paper of those banks is not current.

It charges that said paper, at the time, was only about ten per cent. below specie, and that the contract was entered into to avoid a specie payment, or a payment in funds which were not in common circulation ; that it was not the intention of the parties or agreement, that the $15,000, or any part of it, should be paid in money that was greatly under par, but in current money ; that by said contract, Runnels, Bole, and Hamer, being each the owner of one sixth interests, were to pay $2500 each ; and Pickens and Kirkwood, being the owners of the half interest were to pay $7500 ; Runnels paid his portion to Ives, being $2500 ; and Bole paid a part of his amount to Ives — what amount complainant did not know, and called for a statement ; that Hamer refused to sign said articles, or pay anything for making the road ; but the complainant insists that Hamer is liable and bound by the contract of the others, and that his interest in the property is liable for his proportion, inasmuch as he is entitled to a part of the profits.

The bill charges, that shortly after making said contract, Ives commenced said road, and was prosecuting it to completion ; that on the 2d of July, 1839, he transferred, for value, all his interest in said contract to complainant ; a copy of which transfer is filed as an exhibit to the bill.

The bill states, that the work was so far completed before said

transfer, that in April, 1839, the defendants, Bole and Pickens, applied, under the provisions of the charter, to the Police Court of Madison county, to affix the rate of toll on said road, representing it to be in good travelling condition ; which was done, and copies of the application, and action of the Court in fixing the rate of toll, were exhibited ; and that said defendants have ever since been receiving toll upon said road. Complainant charges, that after said transfer, he expended $2000 or $3000 in completing said road, according to said contract ; and that, after completing the same in every particular, he applied to said Pickens, who represented himself as the agent for said company, for payment, agreeably to the provisions of the contract, which he refused.

The bill charges, that Bole is insolvent ; that his interest in said road has been sold under executions, and bid in by his brother-in-law, for Wm. Pickens, who is his father-in-law, with a full knowledge of his lien upon said property. The bill also charges, that said Jos. C. Pickens is insolvent, and that his interest has been sold by execution, and purchased by the defendant, Wm. Kirkwood, for $68, with full knowledge, &c. ; and that Kirkwood and Pickens were partners in the whole or a part of their stock, at the time of said sale.

The bill charges, that Runnels, Bole, Hamer, Kirkwood, and Pickens, were an incorporated company, proprietors of Montgomery ferry and the eighth of land, including the town of Montgomery and the ferry ; and proprietors of said turnpike, and the land through which it was made ; and that said incorporated property is liable for the debts of said company, in preference to the individual debts of any of said company.

The bill also charges, that they acted in their corporate capacity in making said contract with said Ives, for the construction of said road.

The bill also charges, that the execution sale of the interests of Bole and Pickens embarrasses the title to the corporate effects of said company ; and prays that said sale may be cancelled, so as to enable him to make the corporate effects of said company liable for the balance of his debt for constructing said road. But if the Court should be of opinion that they did not act in their corporate capacity, he charges, in that case, that they are joint-partners in said

tracts of land and property ; and that, as such, said contract was entered into; and that all of said property is liable to his debt, and in preference to the individual debt of every member of the partnership ; and that said execution sales only conveyed the property subject to his debt.

The bill also charges, that the profits arising from said ferry and turnpike, and all the property belonging to said corporation, is a fund, which should be appropriated to the payment of his debt ; and the purchasers, at the execution sales, of interest of Bole and Pickens, whether the defendants acted as a corporation or a partnership association, are not entitled to the profits arising from said turnpike or ferry, until his debt is satisfied ; and if it goes into the hands of Bole and Pickens, they are totally insolvent, and leaves him without any remedy at law.

The bill further states, that when complainant applied to Pickens for payment of the balance due upon the contract, he refused to pay, upon the ground, that the road was not completed according to contract, although they had been receiving toll since 1839.    The bill alleges, that complainant and defendants then agreed, according to the provisions of the contract, to refer all matters in dispute to Burwell Scott, and Wm. L. Wilson, arbitrators ; that said arbitrators met and decided all matters in dispute in favor of complainant, which he relies upon as conclusive between them.    He also charges, that said road was completed, according to contract, in every particular.

He prays that Hamer, Collins, Ives, Runnels, Bole, J. C. Pickens, Kirkwood, and Wm. Pickens, Sen., be made defendants, and compelled to answer ; that the profits arising from said road and ferry may be applied to his debt ; that an account be taken ; that a receiver be appointed, to take possession of said road and ferry, and receive the profits arising therefrom, report the same to the Court, and that the same be applied to the payment of his debt ; and that a sale may be decreed of such portions of said property as will be just, for the payment of the balance of his debt ; and that an injunction be granted against defendants ; that said execution sales be cancelled, and the defendants account for the profits heretofore received by them on Hamer's interest, and that the same be applied to the payment of his debt ; and that said Kirkwood and Wm.

Pickens discover and account for the profits received by them on the interest of Bole and J. C. Pickens, and for general relief, &c.

To this bill a general demurrer was filed, and the cause submitted thereupon.

The counsel for complainant filed no brief.

*Fitch* and *Brown*, for the defendants.

In cases of mistake, if the mistake is clearly made out by proofs entirely satisfactory, equity will reform the contract so as to make it conformable to the precise intent of the parties. Story's Eq. vol. 1, 164. See also *Gillispe* v. *Moon*, 2 John. Ch. Rep. 585 ; *Lyman* v. *United States Insurance Company*, ib. 630. The above principle is fully recognized and admitted. But it is insisted, that there is no allegation in the bill to which the principle can apply. No mistake or fraud is alleged in drafting the contract : there is no allegation that any part of the contract was omitted to be inserted in the articles of agreement ; but, on the contrary, complainant attempts to give a reason why the clause for payment in Brandon and Grenada money, was inserted. So it is evident, from his own statements, that the parties all understood in what the payment was to be made, and that they acted with deliberation and caution. It will be seen, from the cases in John. Ch. Rep. above cited, that the bills allege the mistake, and there is a foundation for the Court to proceed upon. The evidence must be confined to the points in issue in the cause, and can only be used in support of some statement in the pleadings. 1 Smith's Ch. Prac. 346.

Complainant has an ample remedy at law.

He insists, 1st. That the contract was made by the defendants, in their corporate capacity. If that be true, he has his suit at law.

2d. He insists, that if the contract was not made in their corporate capacity, it was made by them as partners. If that be true, his remedy is ample at law, and he can sue them jointly at law.

He does not state any sufficient cause why he resorts to this Court ; such as insolvency, and that he has cause to believe that the fund will be wasted. If it was a partnership business, each partner is liable for the entire amount of the debt.

Sample *v.* Pickens, et al.

CHANCELLOR. (After reciting the facts of the bill.) The question is, shall this contract be carried into effect, according to its literal terms, or shall it be enforced by this Court, according to what is alleged by the bill to have been its true intent and purpose ?

It was said, upon the argument of the demurrer in this case, that no precedent could be found, countenancing such a case as that made by the complainant's bill : this may be true, and yet it would be very far from proving that the case was therefore without the pale of remedial justice. Precedents are neither the exclusive, nor yet, perhaps, at all times, the safest guides in the path of justice. Their authority is always readily acknowledged in like cases, where they furnish a sound exposition of the law upon the particular questions adjudged. Causes are, however, daily arising, for which precedents furnish no rule, except so far as reasoning from doubtful analogies may go. In such cases, a recurrence must be had to the elementary principles of legal science. Let us see, then, whether the features of this case do not place it within the application of well-established principles of equity jurisprudence. It appears, from the allegations of the bill, that a state of things has arisen in connection with the contract of the parties, which no ordinary sagacity could have foreseen, and which renders it inequitable that the parties should be held, literally, to the terms of that contract. The rapid and ruinous depreciation of the paper of the bank, in the currency of which the contract was to be discharged, was an event evidently not contemplated by either of the parties, at the time, and therefore was not provided for by their agreement. Could the complainant have foreseen, at the date of his contract, that the currency which he had stipulated to receive in pay for his work, would depreciate to one tenth of its then value, by the time the work was completed, it is impossible to resist the conclusion, that such a contingency would have been provided against by the terms of the agreement. It is distinctly alleged, that the sum agreed to be paid, was but a fair compensation, in current money, for the work agreed to be done. It would seem, then, that to enforce this contract, literally, would be subversive, as well of the obvious intention of the parties, as of the plainest principles of justice. To relieve against contracts or agreements, on the ground of inequality, or imposed

Sample *v*. Pickens, et al.

burden or hardship on one party, is laid down by a learned elementary writer as a distinct head of equity. (2 Pow. on Con. 145, 146.)

It is said, in every well-constituted government, there is somewhere lodged the power of supplying that which is defective, and controlling that which is unintentionally harsh, in the application of any general rule to a particular case. (1 Fonb. Eq. 5, note.)

Courts of common law act upon contracts according to their terms, however oppressive or unequal may be the consequences. But courts of equity act upon more liberal and enlarged principles of justice. Where, from any defect of the common law, want of foresight of the parties, or other mistake or accident, there would be a failure of justice, a court of equity extends its remedial aid. And so, too, a court of equity will refuse to enforce an obligation, the object of which has failed by an event not expected or looked to by either party ; holding that it would be unjust and inequitable to do so. (Kaimes's Prin. of Eq. 80, 81, 94.) In such cases, courts of equity judge according to the presumed or implied intention of parties, and direct that to be done, which it is probable the parties themselves would have directed, had they foreseen the cause or reason for so doing. (Kaimes's Prin. of Eq. 40.) As in the case of *Newton* v. *Rowe* (1 Vern. 460), where a father articled his son to an attorney, and gave him £120 as the apprentice-fee, the attorney having died within three weeks afterwards, it was decreed that 100 guineas of the sum advanced, should be paid back to the father. I think, then, that the complainant makes such a case by his bill, as *primâ facie* entitles him to the relief asked for. The demurrer must be overruled, with leave to answer.